JOHN BOUCHARD & SONS COMPANY v. L. R. KEATON.

Middle Section.    December 21, 1928.

Petition for Certiorari denied by Supreme Court, March 16, 1929.

468

Roberts & Roberts, and Walter Stokes, of Nashville, for plaintiff in error.

C. H. Rutherford, of Nashville, for defendant in error.

FAW, P. J. The defendant below, John Bouchard & Sons Company, a corporation, brought this case to this court by an appeal in error from a judgment against it for $1000 in favor of the plaintiff below, L. R. Keaton, but, as a matter of convenience, we will refer to L. R. Keaton as plaintiff and John Bouchard & Sons Company as defendant.

Shortly after the noon hour on August 31, 1927, while plaintiff was engaged in digging a post-hole at the foot of a concrete pier of the Jefferson Street bridge, near the bank of the Cumberland River, in the City of Nashville, a short bar of iron, about eight inches in length and weighing about seventeen pounds, fell or was thrown or dropped from the top of the pier and struck plaintiff, fracturing his left shoulder blade and three ribs. The distance from the top of the pier to the ground was twenty-seven feet and plaintiff was on the ground immediately at the foot of the pier. Four employees of defendant were on top of the pier, where they were engaged in riveting steel "channel irons" as a part of the construction of an extension to a sand and gravel conveyor which defendant was building pursuant to a contract with the River Products Company or C. M. Hughes & Company, and the iron bar, known as a "bucking bar," which struck plaintiff, was one of the tools in

possession of defendant's employees on top of the pier as aforesaid, but which, according to the proof, was not in actual use by them at the time plaintiff was injured.

Plaintiff Keaton was employed by the River Products Company or C. M. Hughes & Company as a carpenter and laborer and was working under the direction of D. C. Teal, foreman in the employ of C. M. Hughes & Company or River Products Company.

(C. M. Hughes & Company and River Products Company were separate entities, but they were closely allied in some way not clearly defined in the record, and, for the purposes of this case, they may be treated as identical. It is immaterial to the issues in this case whether C. M. Hughes & Company or River Products Company employed plaintiff, and it is also immaterial whether defendant contracted with C. M. Hughes & Company or River Products Company to build the extension to the sand and gravel conveyor. We will, therefore, treat C. M. Hughes & Company and River Products Company as one and the same).

Plaintiff was not a fellow-servant of the four workmen engaged in riveting steel on top of the pier, as plaintiff was an employee of River Products Company, and the said four steel workers were employees of the defendant, an independent contractor.

The case went to trial before a jury in the circuit court on the issues made by defendant's plea of not guilty to plaintiff's declaration, and, at the close of all the evidence, the defendant moved the court to direct the jury to return a verdict in its favor on four grounds specified in the motion. In this court defendant has assigned errors upon the action of the trial court in overruling its aforesaid motion for peremptory instruction, but has confined its assignments to the second, third and fourth grounds of the motion, which are as follows:

"Second: Because the testimony all shows that the plaintiff assumed the risk and the dangers incident to the performance of the work he was doing, and he well knew all about those dangers.

Third: Because the evidence shows that the relationship that the defendant occupied was that of an independent contractor— that the employees were under the supervision and control of C. M. Hughes & Company and they weren't subject to the orders of the defendant.

Fourth: Because there is no evidence whatever introduced showing any actionable negligence on the part of the defendant, but on the contrary, all of the evidence by which it is sought to hold the defendant liable by reason of this piece of iron falling or being thrown, as the declaration alleged, is purely conjecture, and to allow the jury to pass upon that would simply

be giving the jury the license and the right to guess upon the question of liability. In other words, the proof all shows two or more known causes could have caused the dislodging and falling of this piece of iron."

Passing for the present the "second" ground of the motion, supra: there is an abundance of evidence from which the jury could find that defendant was engaged in the work its employees were doing in the construction of the sand and gravel conveyor as an independent contractor; that is to say, defendant had contracted with the River Products Company to do certain specified construction work as a part of the extension of said conveyor, and, although the construction when complete was to conform to certain agreed specifications, the defendant had the right to do the work according to its own methods and without being subject to control of its employer, the River Products Company, except as to the result of the work. Fleming, Kirkpatrick, Sandefur and Long— the four men engaged in steel construction and at work on top of the pier when plaintiff was injured—were employed and paid by defendant, and no one but defendant had the right to discharge them or to direct and control them as to the method and manner in which they should conduct their work in the performance of the contract. In other words, at the time plaintiff was injured the four workmen above named were servants of the defendant, and as such were engaged within the scope of their employment, and the plaintiff was the servant of a different master, viz.: the River Products Company.

We have thus defined the status of the parties to this suit and the persons whose conduct is here under investigation in connection with the calamity which befell the plaintiff, for the reason that the rule of res ipsa loquitur and the doctrine of assumed risk enter into the consideration of the case.

The manner in which the "bucking bar" which struck and injured plaintiff was used by defendant's employees appears from the testimony of W. H. Fleming, one of defendant's employees and a witness for plaintiff, from whose testimony we quote as follows:

"Q. This is Mr. Wendell Fleming? A. Yes sir.

"Q. You are employed now, Mr. Fleming, by John Bouchard & Sons? A. Yes sir.

"Q. Working for them now every day? A. Well, not every day. I work most of the time.

"Q. How long have you been in his employ? A. Ever since June, about some time in June, I don't remember the date.

"Q. June of last year? A. Yes sir.

"Q. You were working for him in August of last year on this job out here on Jefferson Street? A. Yes, sir.

"Q. Doing the steel work? A. Yes sir.

"Q. Who was your foreman? A. Mr. Bouchard.

"Q. Your employer? A. Yes sir.

"Q. You all were doing nothing but the steel work? A. That is all, the steel work.

"Q. Putting steel on that conveyor? .A. Putting an extension on the conveyor and putting some repairs on it.

"Q. Were you working on that conveyor at the time this man was hurt? A. I was working on the extension, yes sir.

"Q. What were you doing? A. Driving rivets.

"Q. Who was with you? A. There was Kirkpatrick, Sandefur and a boy by the name of Long.

"Q. And you? A. Yes sir.

"Q. That is, four of you? A. Yes sir.

"Q. And you were bucking rivets, bradding, knocking, hammering—mention the tools and the iron you had been using in that work. A. Well, driving them with a hand hammer and they bucked with a big hammer or big piece of iron.

"Q. What kind of a piece of iron? A. Just something to hold the rivet with.

"Q. You were using either that iron or the hammer? A. Yes sir.

"Q. Would you use one a while and then the other? A. We had two rivets on each side and we had to use the piece of iron when we couldn't get the hammer on them.

"Q. You had to have two different kinds of implements to work them with? A. Yes sir.

"Q. When you were using the hammer you would lay the other piece of iron down? A. Yes sir.

"Q. Were you making much noise? A. You know how a hand hammer would sound hitting on a piece of iron.

"Q. Would there be much jarring or vibration about it? A. No sir.

"Q. Would there be any? A. There is bound to be some, yes sir.

"Q. Were you there at the time this man was hurt? A. Yes sir.

"Q. Working right up over him? A. No sir.

"Q. How close to him? A. He was working on one side of the conveyor and I was working on the other.

"Q. I am talking about this man, Mr. Keaton, that was down in the hole. A. That is what I am speaking of.

"Q. Was he under, down in the hole while the work was going on? A. He was exactly under where we was working. We had done finished the side he was working on.

"Q. This piece of iron that fell, was that one of the pieces you were using in bucking rivets? A. Yes sir.

"Q. That is one you would use when you wouldn't use the hammer? A. Yes sir.

"Q. And when you would use the hammer you would lay that down somewhere? A. The man that was bucking rivets did, yes sir.

"Q. And at the time of his injury you had laid this iron down? A. Yes sir."

There is no testimony in the record which reasonably tends to explain the manner in which the bucking bar fell or was thrown or was dropped from the top of the pier. So far as the proof goes, the bucking bar was last seen on top of the pier something like a half-hour to an hour and a half before its fall, under circumstances which will be more particularly mentioned later, but the cause of its dislodgment ·and fall from its position on top of the pier is (in the language of the witnesses) "a mystery."

There were five, and only five, men on top of the pier at the time the bar fell on plaintiff, and four of them testified that they did not see the bar fall and did not know it had fallen until the alarm was given that a man (the plaintiff) had been hurt. The other one of the five men—Sandefur—testified that he did not see the bar leave the top of the pier, and did not know that it had fallen, until he saw it descending towards plaintiff when it was within two or three feet of plaintiff. We quote from Sandefur's testimony as follows:

"Q. You were up there some distance up above the ground? A. Yes sir.

"Q. Riveting steel? A. Yes sir.

"Q. What kind of tools and implements were you using on that job? A. Using a hand hammer and bucking bar in the actual riveting.

"Q. What kind of thing was a bucking bar? A. We had two there. It is a piece of metal used for that. We had a large hammer and we had a small piece of flat, bar iron.

."Q. Using all those things in that work? A. Yes sir.

"Q. What do you call bucking rivets? A. To buck rivets, you hold a tool to the head of the rivet and a man drives it from the other end.

"Q. Bradding it? A. The man with the hammer brads it.

"Q. Have you mentioned about all the tools you were using there? A. How is that?

"Q. Have you mentioned about all the tools you were using there? A. Yes sir.

"Q. Did you have pieces of steel, etc., or a supply of steel pieces or iron pieces? A. No sir, not that I know of.

"Q. This flat piece of iron, was that the thing that fell? A. There was a piece of flat iron fell, yes sir.

"Q. Were you all using that? A. Not at the time.

"Q. Did you have it up there to use? A. Yes sir.

"Q. And had been using it? A. Yes sir.

"Q. Did you see it fall? A. Yes sir.

"Q. Describe to the jury what you saw and the premises there and what you did? A. You mean the work and everything?

"Q. Yes sir. A. There is a pier or column on the Jefferson Street bridge and C. M. Hughes & Company have a sand conveyor built running from there, as close as they could get it to the river, up to their mill, up to the sand pile. They have to convey sand and gravel up from the river and they wanted it made longer and we were putting an extension on this sand conveyor, which extended some few feet out off this column. Of course, the column comes straight up from the ground like that (indicating), I don't know just how high, and we were riveting this extension on to the original belt line, you see, and this man was working practically under me—I don't know just exactly the direction, but he was working under this extension. In other words, we were riveting on this extension and I was bucking a rivet and my head was just in that shape (indicating), looking straight down—I couldn't be looking in any other way—and naturally my eyes fell right on this man. We were riveting this piece of steel and the piece of iron fell off this column.

BY GOV. ROBERTS: We object to any supposition.

"A. Well, the piece of iron fell off the column of the bridge and hit this man. I saw the piece of iron when it was about that far (indicating) from him. I don't know how far—I couldn't tell. The piece of iron was directly between me and him and I hollered at the man.

"BY MR. RUTHERFORD: Q. Hollered at the man—state what you said? A. 'Lookout,' about the same time I heard the piece of iron hit him, you see.

"Q. Hollered how loud? A. 'Lookout' (indicating tone of voice in which he spoke).

"Q. Loud enough for him to hear you twenty-seven feet below? A. I imagine so if his ears was good. I don't know about his hearing.

"Q. Was that flat piece of iron one that you had been using on that job? A. Yes sir.

"Q. What had you been doing with it? A. Bucking rivets, holding it on the head of the rivets.

"Q. It was one of the tools you had in your kit? A. No.

"Q. If it had been laid upon the pier, up this way, now when you were bucking rivets, was that any considerable amount of jarring? Did you hit pretty hard licks? A. Yes sir.

"Q. Did you keep hitting that sort of licks? A. Yes sir, each one.

"Q. What effect would that continual knocking or hitting or jarring on rivets there have on the pier towards making a thing fall? A. I imagine that that continuous contact with the hammer would cause somewhat of a chatter, I would call it. To explain it, we will take, for instance an automobile, the wheels on an automobile on the back end—

"BY THE COURT: I don't think it is worth while to go into the details of that.

"BY GOV. ROBERTS: He says he imagines it, anyway.

"A. I am giving you what I think.

"BY THE COURT: It is immaterial.

"A. It caused it to chatter off the bridge.

"BY MR. RUTHERFORD: Q. You saw it going directly down on him? A. I saw it when it got about that close (indicating).

"Q. And hollered? A. Yes sir.

"Q. Did you go down? A. Yes sir.

"Q. What condition was he in? A. When I got down to him he was lying on the ground on his right shoulder, something like that (indicating).

"Q. Was he complaining any? A. He wasn't saying anything. He was sick."

We quote further from Sandefur's cross-examination (in which he refers to the pier as a "column") as follows:

"Q. Now, this column there you are talking about, how wide was it and how long was it; give us the dimensions of it, about? A. It was about,—well, say the bridge runs east and west, the column is something like as wide as from there—possibly from this desk to the window, the best I can remember.

"Q. Now estimate that in feet, just as near as you can? A. Well, we will say the column we was working on was something like eight or nine feet.

"Q. Eight or nine feet square? A. No.

"Q. Nine feet long? A. Wide,—by about four or five feet across, wide,—the width of the thing four or five feet wide, five feet wide.

"Q. Was the top of it flat? A. Yes sir.

"Q. You all were standing up there on top of it? A. Yes sir.

"Q. Working on this iron work above? A. Yes sir."

"Q. I believe you said there wasn't anybody using this bucking bar, as you call it, at the time it fell? A. No sir.

"Q. You said you were there stooping down? A. Bucking rivet at the time.

"Q. Holding rivet? A. Bucking rivet.

"Q. You were holding a heavy hammer behind it? A. That is the idea.

"Q. You didn't turn this thing loose, did you? A. No.

"Q. You don't know how it came to fall? A. I do not.

"Q. It was nearly down to Mr. Keaton when you saw it, wasn't it? I will say it was within two feet of him.

"Q. You hollered and it hit him about the same time? A. Yes sir.

"Q. Was that platform or thing up there, was it solid or did it have cracks in it that this could have fallen through? A. A solid piece of concrete.

"Q. With the dimensions that you have given? A. To the best of my knowledge, yes sir.

"Q. That was just the top of that column, the pier that came up there, wasn't it? A. Yes sir.

"Q. And was stationary and was solid? A. Yes sir.

"Q. It wasn't wabbly or shaky at all? A. You mean the column?

"Q. Yes sir? A. No.

"Q. You weren't moving around or angling any while you were bucking the rivets; you were standing holding the hammer? A. Holding the hammer.

"Q. Standing still? A. Yes sir.

"Q. And the man who was on the other side driving the rivet through was standing still? A. He was sitting down.

"Q. Driving—what sort of hammer did he have? A. Hand hammer.

"Q. Putting little rivets in? A. Yes sir, small rivets.

"Q. Who was the man that was driving the rivets through up there? A. Mr. Fleming."

The witness Long, one of defendant's four employees on the pier, testified that, so far as he remembered, the last time he saw the bucking bar (before the accident) was when Sandefur was using it to buck a rivet; that this was some time before it fell—probably thirty minutes—but he had no clear recollection of the length of time; that he (Long) was "sticking rivets", that is, he was carrying the heated

rivets from the forge (which was operated by Kirkpatrick) and "sticking" them in the holes where they were being bradded by Fleming and Sandefur.

The witness Kirkpatrick, also one of defendant's employees on the pier, testified that he had not had the bucking bar in his hands at any time and did not know anything of its whereabouts before it fell on plaintiff and did not know it had fallen until he heard someone say that "a man was hurt."

The witness John Graves was an employee of C. M. Hughes & Company and was "working on the hopper right down under the concrete pier," but, according to his testimony, he had just gone up on top of the pier (for an unexplained reason) and was standing on the side of the pier opposite to that from which the bar fell. Graves testified that he did not see the bucking bar, did not know where it was before it fell on plaintiff, and did not "know how it came to fall off."

The plaintiff, Keaton, testified that he did not see the iron bar until it had knocked him down. We quote from his testimony as follows:

"Q. And you didn't know it was coming? A. No sir. The first I knowed I heard some fellow holler 'Lookout' and before I could turn my head it hit.

"Q. You heard a voice say 'Lookout'? A. Yes sir.

"Q. Did that come from where? A. Up above.

"Q. Immediately above you? A. Yes sir.

"Q. It came from that crowd that was working on that steel up there? A. Yes sir.

"Q. What did you do after it hit you, where did they take you? A. When it hit me it put me in the mud on the bank. I had one foot in the hole and the other foot up on the bank and I was down with a shovel this way (indicating), and when it hit me, I fell out upon the bank."

There is but one other witness whose testimony relates to the whereabouts of the bucking bar at any time before plaintiff was injured by it, and that is D. C. Teal, an employee of C. M. Hughes & Company and under whose direction plaintiff was working. We quote from Teal's testimony as follows:

"Q. Mr. Teal, I overlooked asking you a question when you were on the witness stand before about had you been up there before Mr. Keaton was hurt, up on there where these men were at work, and did you see that piece of iron that fell, the one that answered that description? A. Yes sir.

"Q. Where was it laying? A. It was laying on the belt conveyor.

"Q. Take that poker and illustrate, will you, how that thing comes down, about at what angle? A. I don't know whether I could represent the exact angle or not but it comes down something like that, I guess (indicating with pointer).

"Q. You say you were working at a point about like this here (indicating)? A. They were working down—like this is the end of the old conveyor, they were working here, connecting the extension to it down here. The old conveyor was laying on this pier under there.

"Q. Now, where was the piece of flat iron when you saw it and picked it up? A. It was laying on this old conveyor.

"Q. Did you move it? A. Yes sir.

"Q. Where did you move it? A. There was a level piece right here that this conveyor rested on. I laid it on it.

"Q. What did you do that for? A. I thought it probably might slip off.

"Q. Was it in a position close to slipping off? A. It was down a couple of feet from the end of the conveyor.

"Q. And you put it in a safer place? A. Yes sir.

"Q. How long was it before the man was hurt? A. Probably half an hour or probably an hour.

"Q. And they were working in the meantime there? A. Yes sir.

"BY THE COURT: Q. Was this thing when you left it laying on top of that cement block, that cement pier, or was it laying on the incline? A. It was laying not on the cement pier but on the level piece of wood that this conveyor rested on, the frame we called it, not down on the concrete pier but on this piece of wood.

"Q. That level piece of wood that it was on, was it resting on the concrete? A. Yes sir, on the concrete.

"Q. It wasn't on that slant? A. No. I taken it off the incline and laid it on top of the level.

"Q. The last you saw of it it was laying there on the pier or block of wood that was on the pier? A. Yes sir.

"BY MR. RUTHERFORD: Q. Laying in a flat position? A. Yes sir.

CROSS-EXAMINATION.

"BY GOV. ROBERTS: Q. Did they just have one of these flat iron pieces? A. This one is all I seen.

"Q. And then they had some hammers, didn't they, that they used in riveting or bucking pieces? A. Yes sir.

"Q. And so far as you know, the last time this flat piece was ever used or anybody ever had their hands on it was when you

laid it down there? A. I laid it down and we went to work. Though I seen it after Mr. Keaton was hurt.

"Q. You laid it down on a loose plank? A. No, stationary.

"Q. How big was that plank? A. I think it was an eight by eight, as well as I remember.

"Q. Was it just an inch thick? A. Eight by eight.

"Q. Several feet long? A. Yes sir.

"Q. And that eight by eight was lying up there on top of this? A. Like this on the concrete pier (indicating) across here. The eight by eight was lengthwise like this.

"Q. And instead of laying it down on the concrete pier you laid it up on the eight by eight? A. Yes sir.

"Q. And you laid it right by the edge of the concrete? A. No sir, it was laid back. It was probably two feet from the edge.

"Q. You laid it back, you think, two feet from the edge? A. Yes sir, probably that. . . .

"Q. Did you have any authority over the iron work or steel work there at all? A. No.

"Q. That was up to Bouchard entirely, he did it and all about it? A. I had no authority over that at all.

"Q. You say you laid that thing over there back from the edge. What did you do that for? A. I supposed it might slip off on us down there.

"Q. Now, could it have fallen from where you put it on its own hook if somebody hadn't knocked it off? A. No. If it had fallen from there it would have fallen on the concrete.

"Q. These men, were they working there after you left it? A. Yes sir.

"Q. Right at the place? A. Yes sir.

"BY GOV. ROBERTS: Q. Now, about how long from the time you put this flat piece of iron up there on this eight by eight until the accident happened, until it fell? A. Well, I couldn't say. There was three holes dug down there. It probably was about an hour or an hour and a half. It might not have been over thirty minutes, I couldn't tell.

"Q. Then, of course, you don't know what happened in the meantime, what was done? A. No."

Whether the iron bar was used by defendant's employees to buck rivets after it was placed on the piece of timber by the witness Teal as stated in his testimony above quoted, and before it fell on plaintiff, is a matter of conjecture, in view of the expressed uncertainty of the recollection of the witnesses as to the intervening time. For the purpose of preventing just such an accident as that which later occurred, Teal removed the bucking bar from the inclined conveyor to what he regarded as a place of safety, but he did not take it from

the possession and control of the defendant's employees, and it is a necessary inference from all the circumstances that it was later moved by someone from the position in which Teal placed it as aforesaid, unless it was possible for the vibration caused by hammering the rivets to move it from that position to the edge of the pier and off the pier.

It is averred in plaintiff's declaration that "said men, agents and servants of defendant who were acting at the time for defendant in doing its work, carelessly and negligently dropped a large, heavy piece of steel from said scaffold or landing above plaintiff, either threw or dropped said piece of steel off of said scaffold or landing and caused it to fall a distance of some twenty-seven or twenty-eight feet down and upon plaintiff, etc." Then, after describing the injuries to plaintiff's person, it is averred that the aforesaid injuries were suffered by plaintiff "all on account of the gross and inexcusable negligence and carelessness of said agents and servants of defendant who were acting for and on behalf of defendant at the time and within the scope of their duty and authority in doing the defendant's work, and in doing so carelessly and negligently caused said large and heavy piece of steel to be thrown down and upon plaintiff injuring him as aforesaid."

It is insisted for defendant, in substance, that, in as much as plaintiff avers in his declaration that the agents and servants of defendant "either threw or dropped said piece of steel off of said scaffold or landing," plaintiff must, in order to recover, affirmatively prove the specific act or acts of negligence thus averred, and that there is not only an absence of such proof, but that each of the agents and servants of defendant present at the time in question testified, without contradiction, that he did not throw or drop the bar on plaintiff. This would be a potent argument and, to say the least, worthy of serious consideration, if the facts of this case did not bring it within the rule of res ipsa loquitur. E. Tenn. Coal Co. v. Daniel, 100 Tenn., 65, 73, 42 S. W., 1062; Railroad v. Lindamood, 111 Tenn., 457, 462, 78 S. W., 99. But where res ipsa loquitur applies it is not necessary to point out specific acts of negligence in the pleadings, and, if specific acts of negligence are pleaded in such case, such pleading is, under the practice in this State, merely surplusage. Nashville Interurban Railway v. Gregory, 137 Tenn., 422, 433, 193 S. W., 1053; Northcross v. Theater Company et al., 3 Tenn. App. R., 51, 58.

"Where the particular thing causing the injury has been shown to be under the management of the defendant or his servant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation, that the accident arose from a want of care." Annotation, L. R. A., 1917-E, p. 9, and cases there cited.

In North Memphis Savings Bank v. Union Bridge & Construction Co., 138 Tenn., 161, 177 (196 S. W., 492), it is said:

"The rule res ipsa loquitur, in its primary or distinctive sense, may be thus defined: Where the evidence shows an injury inflicted, and also the physical thing inflicting it, and that thing does not usually, or in the ordinary course, produce such a result where due care is exercised by those in charge of it, it may be inferred that those so in charge of the thing inflicting the injury failed to exercise such due care; that is, that they were guilty of negligence."

And in Northcross v. Theater Company et al., supra, at page 57, it is said:

"Where a thing which has caused an injury is shown to be under the management of defendant, and the accident is such as in the ordinary course of things does not happen, if those having the management exercise the proper care, the accident affords reasonable evidence, in the absence of explanation, that it arose from want of care."

Other Tennessee cases to the same effect are cited in the opinions from which the above quotations are taken.

In the instant case, we are of the opinion that the bucking bar which inflicted the injury for which plaintiff is suing is shown to have been in the possession and under the control and management of the defendant's agents and servants while engaged in the defendant's business, and that *"in the ordinary course of things"* the bar would not have fallen on plaintiff, under the circumstances disclosed by the record, if defendant's servants had exercised due care in the premises. 1 Thompson on Negligence, sec. 1217; Dixon v. Pluns, 98 Calif., 384, 33 Pac., 268, 20 L. R. A., 698, 700. In this view, the maxim, res ipsa loquitur, applied, and entitled the jury to draw an inference of negligence on the part of the defendant if, in view of all the circumstances and conditions shown by the evidence, they felt warranted in doing so, and thus the peremptory direction of a verdict for defendant on the theory that there was no evidence to support the plaintiff's averments of actionable negligence was forestalled. "The office of the rule res ipsa loquitur is, in the main, to determine whether, on the state of facts shown, the case should go to the jury." (138 Tenn., p. 188, supra).

Our Supreme Court has, in at least three published opinions, approved a statement of the Supreme Court of the United States in the case of Sweeny v. Erving, 228 U. S., 233, 240, 57 L. Ed., 815, 819, as follows:

"In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evi-

dence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff." See North Memphis Savings Bank v. Union Bridge & Construction Co., supra, p. 188; Gill v. Brown, 130 Tenn., 174, 178, 169 S. W., 752; Memphis Street Railway Co. v. Cavell, 135 Tenn., 462, 470, 187 S. W., 179.

Holding, as we do, that the trial court did not err in overruling the third and fourth grounds of defendant's motion for peremptory instructions, we now recur to the *second* ground of the motion, viz: that "the testimony all shows that the plaintiff assumed the risk and the dangers incident to the performance of the work he was doing, and he well knew all about those dangers."

Notwithstanding our conclusions as above stated with respect to the questions raised by the third and fourth grounds of the defendant's motion for peremptory instructions, the motion should have been sustained if there was undisputed evidence which, with all reasonable inferences to be drawn therefrom, sustained the second ground of the motion, supra. Traction Company v. Brown, 115 Tenn., 323, 331, 89 S. W., 319.

In strictness, the technical doctrine of "assumption of risk" applies perhaps only to the contractual relation of master and servant, but one frequently finds in opinions of the courts the expression "assumption of risk" as the practical equivalent of the term "contributory negligence." 20 R. C. L., p. 109, sec. 95.

In 45 Corpus Juris, p. 944, sec. 503, it is said:

"While, under certain circumstances, the same acts or conduct may render one guilty of contributory negligence or give rise to the defense of assumption of risk, 'assumed risk' and 'contributory negligence' are distinct doctrines of law, and are not synonymous. The doctrines are distinguished from each other elsewhere in this work. In common parlance, however, the reckless disregard of a danger is often spoken of as an assumption of risk by the party exposing himself thereto, although it is not the ordinary assumption of risk arising out of contract relations."

And it has long been the law, based on the ancient maxim, volenti non fit injuria, that one who voluntarily places himself in a position of peril, knowing and appreciating the danger, assumes the risk thereof. Broom's Legal Maxims, 8 Ed., p. 267, et seq.

In the case of Indiana, Etc., Oil Co. v. O'Brien, 160 Ind. 266, 271-272 (65 N. E., 918), the court said:

"Counsel for appellee insist that the doctrine of the assumption of risk must be confined alone to cases of negligence wherein the relation of master and servant or other contractual relations existed between the parties at the time of the accident, and can not be extended to a class of cases to which the one at bar belongs. It may be said that the principle commonly denominated 'assumption of risk,' in its technical sense or meaning, as recognized and applied in cases where the relation of master and servant or other contractual relations existed between the parties at the time of the accident, does not extend or apply to a class of cases to which the one under consideration belongs. Nevertheless we hold that what the authorities treat or consider as the doctrine of 'incurred risk' or 'taking the risk or hazard' or 'running the risk' incident to a known and appreciated danger, whatever the terminology used to denominate the doctrine may be, is applicable to a case of the nature or character of the one under review. In such cases, however, the doctrine of 'incurred risk' or 'taking the risk' or 'running the risk' may be said to rest upon, or be, in its nature, effect, and import, the equivalent, at least, of the principle expressed by the maxim volenti non fit injuria, and is not founded on the theory of an implied agreement or contract as is usually asserted in suits by a servant against the master. This doctrine or principle, as asserted, is of universal application, and is not confined alone to cases where the relation of the parties are of a contractual nature. Therefore, independently of such relations, there may be in a case like the one at bar an element to the effect that the injured party by his acts in the premises is shown to have incurred or taken upon himself the risk incident to a known and appreciated danger, and if the facts disclose such a feature or element in the case, it should be recognized and treated accordingly, and not merely as one constituting contributory negligence."

In Miner v. Connecticut River Railroad Co., 153 Mass., 398, 402-403 (26 N. E., 994), it is said:

"Independently of any relation of master and servant, there may be a voluntary assumption of the risk of a known danger, which will debar one from recovering compensation in case of injury to person or property therefrom, even though he was in the exercise of due care. In other words, it may be consistent with due care to incur a known danger voluntarily and deliberately; and this may be so when the danger arises from the known or apprehended neglect or carelessness of others."

In Standard Oil Co. v. Titus, 187 Ky., 560, 563 (219 S. W., 1077), the court said: ·

"In view of the fact that the doctrine of assumed risk is not based entirely on contract, but grows out of the application of the maxim, 'Volenti non fit injuria,' it is well settled that independently of the relation of master and servant, there may be a voluntary assumption of the risk of a known danger which will debar one from recovering compensation in case of injury, even though he. was in the exercise of due care."

The statement of the law last quoted was approved and applied in the case of McLeod Store v. Vinson, 213 Ky., 667, 281 S. W., 799, 800. And the same principle was announced and applied in the case of McLean v. Studebaker Bros. Co., 221 N. Y., 475, 117 N. E., 951, 1 A. L. R., 1551, 1553.

The same doctrine (described as assumed risk) has been applied in this State to a case wherein the relation of master and servant did not exist between the plaintiff and defendant. An Ice Company contracted with the Terminal Company to ice refrigerator cars on the premises of the Terminal Company. Baker, an employee of the Ice Company, while engaged in icing a car in the performance of his employer's contract with the Terminal Company, fell from the top of a car and was injured. In the course of its opinion disposing of Baker's action for personal injuries against the Terminal Company, the Supreme Court said:

"The other allegation is that plaintiff did not know of the snow and ice being on said car, which defendants had negligently allowed to be there, and failed to warn plaintiff against the danger. This was a danger that was open and obvious to plaintiff the moment he climbed upon the car, and having assumed the risk of icing the car under such conditions, he cannot be heard now to complain." Baker v. Railroad, 106 Tenn., 490, 500, 61 S. W., 1029.

The case of Baker v. Railroad, supra, is one of the cases cited in 44 A. L. R., at pp. 1124-1125, as supporting the statement of the Annotator that "by most of the American courts which have had occasion to express their views upon the subject, the remedial rights of a contractor's servant have uniformly been determined upon the theory that his assumption of a risk becomes a conclusion in point of law, whenever it appears that the injured person was chargeable with knowledge, actual or constructive, of that risk."

The undisputed evidence in the case at bar shows that the plaintiff knew and appreciated the precise nature of the danger and peril in which he was placing himself when he set to work to dig a hole beneath the riveters on the pier. We quote from the testimony of plaintiff Keaton as follows:

"Q. Now, when you went down to dig that hole, who told you to go down there, Mr. Teal? A. Mr. Teal.

"Q. And you said he was with you? A. Yes sir, until about fifteen minutes before, he was with me.

"Q. You knew, of course, when you went down there to dig that hole that they were riveting, when you went down there? A. Yes sir.

"Q. You knew you were working right directly under them? A. Yes.

"Q. Had you noticed any rivets dropping around there? A. That was the only thing that fell.

"Q. You knew something was likely to fall there? A. We was all the time warning them, Mr. Teal was.

"Q. I am not talking about warning. I am talking about what you knew. Didn't you know that you were in a dangerous place? A. Anything else might fall but we didn't know there was anything else but the tools they was working with.

"Q. They had tools up there? A. I say but the tools they was working with.

"Q. You knew you were in a dangerous place then, didn't you? A. Why, yes sir, I realized it was a dangerous place."

We also quote from foreman Teal's testimony as follows:

"Q. Now, before this man was hurt, Mr. Teal, had you given Bouchard's men any warning to not drop anything down on anybody that was working there? A. Yes sir, I warned them when we started down and also warned them after we got down there.

"Q. Keaton knew you had given warnings to these men? A. Yes sir.

"Q. And heard it? A. Yes sir.

"Q. And then you told him to go down there and dig these holes? A. We were both down there but I had left just at that present moment.

"Q. You had talked about the danger of it, you and Mr. Keaton? A. I don't know whether we had talked about it or not. I don't remember about that. I just warned the men before we went down and when we went down.

"Q. And Keaton was present and heard it? A. Yes sir."

It thus appears from the testimony of the plaintiff and his witness Teal that plaintiff voluntarily took the hazard and risk of injury when he took his position at the foot of the pier where the iron bar fell upon him. There is no evidence in the record from which a contrary inference might be drawn. It follows, as a matter of law, that plaintiff is not entitled to recover compensation for his injuries from

defendant, and the trial judge should have sustained the second ground of defendant's motion for peremptory instructions.

This question was made in defendant's motion for a new trial below, and the motion was overruled. The judgment of the Circuit Court is therefore reversed, the verdict of the jury is set aside, and the plaintiff's suit will be dismissed.

The costs of the appeal will be adjudged against the plaintiff L. R. Keaton.

The costs accrued in the circuit court will be adjudged against the plaintiff and the surety on his cost bond.

Crownover and DeWitt, JJ., concur.