New York Life Ins. Co. *v.* Nashville Trust Co.

(*Nashville,* December Term, 1941.)

Opinion filed February 28, 1942.

438

Seay, Stockell & Edwards, of Nashville, for appellant.

WALKER & HOOKER and LAURENCE B. HOWARD, all of Nashville, for appellee.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This suit was brought to recover upon two policies of insurance written on the life of Thomas C. Buntin by the New York Life Insurance Company for $25,000 each. The policies were payable to Nashville Trust Company as trustee for the benefit of Buntin's wife and children. A small loan had been obtained on each policy. There was a judgment in the circuit court for the amount of the two policies with interest, less the loan, the judgment aggregating $53,588.76. This judgment was affirmed by the Court of Appeals and we granted petition for *certiorari*.

For several years prior to September 24, 1931, Buntin had been the manager of an insurance agency in Nashville known as James E. Caldwell & Son, which was a business organized and owned by Buntin's grandfather whose name the corporation bore. On September 24, 1931, Buntin disappeared from Nashville and nothing had been heard from him by members of his family, by his friends, or business associates up to June, 1940, when this case was tried below. So far as appears, nothing has been heard from him by any of these persons yet.

Premiums on these policies had been paid up to April, 1932—some six months or more after the date of Buntin's departure. Default was made in payment of these last premiums and the net cash value of the policies was applied to the purchase of term insurance, which carried the insurance until March 8, 1933.

The plaintiff relies on the presumption of death generally arising from seven years' absence without tidings, etc., and the plaintiff further submits that there is circumstantial evidence in the case entirely adequate to sustain the finding of the jury that Buntin died prior to March 8, 1933, the expiration date of the insurance.

Defendant Insurance Company submits that the evidence in the case, direct and circumstantial, is such as to dispel any presumption that Buntin is even now dead and is such as to preclude any finding that Buntin died prior to March 8, 1933. Defendant Company therefore insists that the trial court erred in refusing to direct a verdict in its favor and that presents the main question we have to consider.

There is no particular dispute about the applicable law. As stated by this Court in *Marquet* v. *Ætna Life Insurance Co.*, 128 Tenn., 213, 159 S. W., 733, 736, L. R. A. 1915B, 749, Ann. Cas. 1915B, 677, the general rule is that " 'a person shown not to have been heard of for seven years by those (if any) who, if he had been alive, would naturally have heard of him is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard from without assuming his death.' *Davie* v. *Briggs,* 97 U. S., 628, 24 L. Ed. [1086], 1088, and authorities there cited."

To the foregoing is added the statement that this inference of death is but a presumption "and it cannot arise unless the absence remains unexplained after diligent inquiry is made of the persons and at the places where tidings of the absentee, if living, would most probably be had." *Ibid.*

In *Ballinger* v. *Connecticut Mutual Life Insurance Co.,* 167 Tenn., 367, 69 S. W. (2d), 1090, the Court stated

that the death of an absent person may also be presumed in less than seven years if the circumstances in evidence warrant such conclusion. To the same effect are *Shown* v. *McMackin,* 77 Tenn. (9 Lea), 601, 42 Am. Rep., 680, and *Puckett* v. *State,* 33 Tenn. (1 Sneed), 355. This ruling was supported in the Ballinger case by many authorities there collected. To these may be added the more recent cases of *Kansas City Life Ins. Co.* v. *Marshall,* 84 Colo., 71, 268 P., 529, 61 A. L. R. 1321, and *American National Ins. Co.* v. *Hicks* (Tex. Com. App.), 35 S. W. (2d), 128, 75 A. L. R., 623, and cases collected in the Notes in American Law Reports following the two decisions mentioned as they appear in those volumes.

It was also noted in the Ballinger case that the seven years presumption of death may be looked to in aid of evidence tending to show death at an earlier period and this is the general rule as appears from authorities to which reference has just above been made.

*Tisdale* v. *Connecticut Mutual Life Ins. Co.,* 26 Iowa, 170, 96 Am. Dec., 136, is often referred to as the leading case supporting the rule just mentioned. In that case the Court said: ''Any facts or circumstances relating to the character, habits, condition, affections, attachments, prosperity and objects in life, which usually control the conduct of men, and are the motives of their actions, are competent evidence from which may be inferred the death of one absent and unheard from, whatever has been the duration of such absence. A rule excluding such evidence would ignore the motives which prompt human actions, and forbid inquiry into them in order to explain the conduct of men.''

It was expressly held in the Ballinger case that an inference of death might arise from disappearance under

circumstances inconsistent with the continuation of life although exposure to a particular peril at the time of disappearance was not shown.

Such being the law, we consider in some detail the circumstances attending the life, temperament, habits, disappearance and continued absence of the insured herein, together with some direct evidence offered by defendant Insurance Company as to survival.

Buntin was nearly thirty years of age when he disappeared. He had been married several years and had three boys, to whom he appeared much attached, and who were said to be very fond of him. The relations between his wife and himself are shown to have been good. He was quite dissipated, as will more fully appear, but the proof does not indicate that his wife turned against him on this account. On the contrary, she tried to help him overcome his weakness as to liquor. It does not appear that she knew of his attentions to a young woman hereafter mentioned.

Buntin's father was a man of means. His mother perhaps had independent means and belonged to a family of wealth. Young Buntin, therefore, was reared in affluent circumstances. He had not known hardships and was physically and mentally unfitted to undergo hardships. As manager of this insurance concern he drew a salary of $300 a month before leaving Nashville. In addition to this his mother made him an allowance of $200 a month. This insurance business belonged to his grandfather, James E. Caldwell, and while he claims the young man was capable, other business men testifying in the record said that Buntin owed his job to his grandfather and was not qualified to obtain or hold any responsible position. In fact one of these witnesses expressed the

opinion that about the only thing that young Buntin could do would be to act as an entertainer or something of that sort at a clubhouse or like resort.

There is much evidence in the record as to Buntin's disposition. He seems to have been a morbid type, subject to frequent fits of depression and alternate fits of exhilaration. When in these depressed moods, he would resort to intoxicating liquor, stay drunk for a time and, reacting from the spree, again drop into a state of depression. As expressed by Dr. John C. Burch, Buntin's physician, the latter's moods moved in a vicious circle.

Dr. Burch frequently treated Buntin for alcoholism, undertaking to straighten him out after his sprees. Dr. Burch and Dr. Tinsley Harrison both testified substantially that Buntin was a depressed, nervous, unstable, maladjusted individual. That he was naturally of this type and that these infirmities were enhanced by his excessive use of liquor.

Dr. Harrison, a specialist in nervous diseases, said that perhaps 80 per cent of suicides were individuals of the same type as Buntin. The witness further said that a tendency to suicide is hereditary.

As a matter of fact, Buntin's father committed suicide. He had, or thought he had, a disease which would render him imbecile and make of him a nuisance to his family, and with this belief took his own life. Young Buntin, the insured, knew how his father's life had been ended and frequently talked about it, justifying his father's act. It seems that the young man occupied the room in which his father had committed suicide and that there was a hole in the wall made by the bullet that killed his father. This hole was pointed out at times by young Buntin to visitors in his home.

There is considerable proof in the record that the young man talked to others about committing suicide and ending his troubles. This talk, while not taken seriously by some of the witnesses, seems to have impressed others. Buntin's wife said that she woke up in the night on one occasion, found him up in the room with a pistol in his hand, and took it away from him after a struggle, during which the pistol was discharged. Another witness noticed a pistol in Buntin's office when the latter was talking about suicide and this witness made Buntin give him the pistol. Dr. Burch, who was Buntin's friend as well as his physician, was apprehensive that the young man would kill himself and took precautions accordingly on at least one occasion.

At the time that he disappeared, Buntin and his family were living in Robertson County at a place that belonged to the young man's mother. He would drive in and out of Nashville each day. He left home on the morning of September 24 at the usual time, apparently in fair condition, and drove into Nashville. He took nothing to indicate that he did not expect to return home that evening as customary. When he got to Nashville, he left his car at a garage for some repairs. He never called for the car.

Buntin did not return to his home on the night of the 24th. No one knew where he was. Some inquiries were made but no especial alarm seems to have been felt at that time.

On September 26 the young man had not returned. On that day two communications were received in the mail, one by Allison Buntin, the young man's uncle, and one by James E. Caldwell, the young man's grandfather. Each of the envelopes was postmarked St. Louis. Each en-

velope contained a type-written will which appeared to be identical in terms. Both documents were signed by young Buntin and that both signatures were his is very well proven on the record.

Rather singularly both of these documents were lost before the hearing and not produced. That there were such documents, however, can scarcely be controverted on the evidence before us. The paper received by Allison Buntin was turned over to George Gale, a highly reputable Nashville attorney, who testified in detail as to the contents. Mr. Gale placed this in his files but shortly thereafter went to Washington, where he remained several years, and upon his return the file could not be located. Allison Buntin died before the trial herein. Gale and Mrs. Tom Buntin, however, both were clear in their testimony as to the provisions of this document and its nature. By the will the insured left his property to his wife and children. The grandfather of the young man likewise is clear as to the contents of the similar paper he received. He sent his paper to Nashville Trust Company and that paper also appears to have been mislaid.

Upon the receipt of these communications by the uncle and the grandfather, the family became somewhat alarmed and the grandfather telephoned to a business associate and friend in St. Louis to have inquiries made and endeavor to locate the young man. This gentleman in St. Louis made inquiries at a dozen or more hotels in that city without result. It is evident from his testimony that he thought the boy was off on a spree somewhere and was not particularly exercised, although he later called the grandfather at Nashville and told the latter that he had done everything possible to find the boy without success.

A day or two before the insured left his mother had given to him his monthly allowance of $200. He had done some drinking since the receipt of that money. He left his wife with $1.50, and so as far as she knows he did not have any considerable amount of money on his person. It is not likely that he had any great amount in the bank. His grandfather's bank had closed. It developed in the proof that his concern owed one of the local banks upwards of $70,000 and the business was wound up as insolvent shortly after Buntin's departure with practically no assets. The proof does not indicate, therefore, that the young man could have left Nashville with any substantial sum of money.

The theory of defendant Insurance Company is that Buntin left Nashville on account of an infatuation for a young woman who had formerly been in his employ as bookkeeper and stenographer. She had not been in Buntin's office for some months before his departure but had returned to her home in a nearby Kentucky town. It is shown in the record that during the summer before he left Buntin would make frequent trips up into Kentucky in his automobile and that this young woman would leave home in her automobile and that they would meet at intermediate points. These meetings would sometimes occur three or four times a week. When the two young people would meet, it seems that they would on occasions get in the same car and drive around or drive off together. There is some testimony that they would drive off on a secluded road but that is as far as the evidence goes. There is no evidence of immoral conduct by the two and the reference of counsel to the young woman as the paramour of Buntin is a stronger characterization than the proof justifies. It is doubtless true that

there was a mutual infatuation between these young people, but there is nothing in the record from which we could conclude that the relations between the two were lewd.

About six weeks after Buntin left Nashville this young woman left her home in Kentucky, stating that she was coming to Nashville to visit friends. She did not return at the appointed time and her father telephoned to Nashville to make inquiries about her. She had not visited these friends at all. On the day of her arrival in Nashville, she made a payment of $50 on an account of hers at a ready to wear store. It was found that she took a taxicab and carried her bag to the Union Station and checked it. Later the bag was reclaimed. Nothing has been heard of this young woman by her friends or family since she went to Nashville and, as stated before, it is the theory of defendant Company that Buntin and the young woman met after she left and that they live together somewhere, both concealing their whereabouts, on account of such disgraceful liaison.

When the girl left her home in Kentucky she drew $50 out of the bank. So far as her father knew she had no considerable amount of money on her person. Since she left, her mother has died and her brother has died. Her brother was a naval officer killed in an air crash in the Philippines. His death was widely published and the death of the mother was noticed in the Louisville and Nashville papers. This young woman has to her credit at home and presently available about $10,000. She has also accumulated income on a trust fund of $27,000. During her absence she has not called on her family or her bank for a penny nor have any of these parties heard from her nor of her.

Aside from the theory above mentioned, which it is insisted the circumstances justify, defendant Company has introduced certain witnesses in the effort to prove that Buntin was alive as late as January, 1935, nearly two years after the expiration of the insurance.

A young man named McClellan, formerly in the Navy, but retired, testifies that he was sitting in the lobby of a hotel in Lima, Peru. He said that he saw a man come in the door that he took to be Tom Buntin and started to speak to the man but that the latter looked at him, turned away, and walked out on the street. McClellan said that he followed the man out on the street but lost sight of him and could not locate him again.

McClellan made inquiries at the hotel as to whether Buntin was stopping there and was answered to the contrary. On returning to Panama where his family was located, McClellan mentioned to his mother that he thought he had seen Tom Buntin in Lima. McClellan then learned about Buntin's disappearance. McClellan's family had formerly lived in Nashville, he had been reared there, and knew Buntin. While McClellan was in the Navy he was at home about once a year on leave and frequently saw Buntin.

McClellan did not talk to the man that he took to be Buntin and could not be altogether positive in his identification. According to the best of his belief, however, he said he thought the man he saw was Buntin.

On a later visit to Nashville McClellan told about having seen Buntin and defendant Insurance Company learned of this and employed McClellan to go back to South America and try to locate Buntin. McClellan did go back. He was unable, however, to find Buntin. He took a photograph of Buntin back with him to South

America and in Lima found a taxicab driver, a bartender, and a doorman at a country club who said that they recognized the photograph as being the picture of a man they had served in their several capacities during the winter of 1935 when some notable celebration was going on in Peru.

None of these witnesses could speak English. Their depositions were taken by interrogatories. They were questioned and their answers transcribed under the direction of an interpreter—all formalities being observed in taking these depositions. The questions asked were at least suggestive, if not leading.

Several weeks after Buntin left home, the Nashville Trust Company wrote the defendant Insurance Company advising of his disappearance and the possibility of a claim being thereafter made on the policies. Defendant Company began investigation and later sent an inspector from its district office at Atlanta to Nashville and he interviewed Buntin's wife and perhaps his mother and others. He testified that Mrs. Buntin co-operated with him cheerfully, gave him a photograph of her husband, described the large ring that he was in the habit of wearing, and furnished other details.

During the taking of depositions in this case in New York City the chief inspector of defendant Company was examined by the plaintiff with reference to efforts made to locate Buntin. This witness testified that the defendant Company did business in every State in the Union with the exception of Texas, and did business in Canada and some foreign countries. That the Company had 150 branch offices in the United States and Canada and 19 branch offices of its inspection department scattered over the country. The witness further testified that

investigations had been made by defendant Company in an endeavor to locate Buntin and also to locate the young woman but that so far neither had been found and the only information acquired by the Company about either seems to have been that furnished about Buntin by the witness McClellan and the witnesses in Peru to whom the photograph was shown. The inspector said that it was difficult to locate a missing person without fingerprints.

It appeared during the taking of this inspector's deposition that he had before him a large file, apparently copies of correspondence, reports, etc. He was asked if he would file the papers that he had and were in the Company's possession reflecting on the efforts made to locate Buntin and the young woman. Under instruction of counsel, the witness declined to furnish these papers, counsel observing that the Company did not propose to assist the plaintiff in a fishing expedition. This witness testified further on the trial at Nashville. He then tendered such of the files as related to investigations through his department. The files of the law department, however, were not offered.

It is pointed out by defendant that Buntin's family do not seem to have made any great effort to discover him just after his disappearance. This may be true. Perhaps they were afraid of finding him with the young woman and uncovering a scandal. However, members of his family said that they had no idea where to look for him beyond St. Louis, nor does it appear that they had any particular facilities for making a search. Their attorney did make a considerable search before this suit.

The foregoing is the substance of the testimony and the determinative question is whether the circumstances

detailed furnish sufficient support for a finding by the jury that young Buntin came to his death prior to March 8, 1933.

▇ The evidence being circumstantial, were the jury justified in concluding that death of the insured prior to March 8, 1933, was a more probable hypothesis than his continued existence after said date? Can we say that the finding of the jury was based on conjecture rather than upon the balance of probabilities? Should we sustain the motion for a directed verdict? We think not.

On the one hand was Buntin's infatuation with the young woman. The probability that this would outweigh his love for his wife and children and his obligation to his family and his necessities. A probable desire to get away with the girl and live with her where they were not known and where disgrace of the elopement would not follow them. If we leave the young woman out of the picture, the record hints at no reason for Buntin leaving home and concealing his whereabouts through the months and years that followed.

That Buntin was joined by the girl is surmise. She did not leave her home until some six weeks. after his departure and there is nothing in the record to show that they subsequently met or communicated in any way with each other. It is quite as easy to surmise that she never found him, or, she being infatuated with the young man, that she heard of his disappearance, took it to mean his suicide and thereupon left home and made away with herself. As before indicated, the young woman belonged to a fine family, bore an excellent reputation, and there is nothing in the evidence showing that the relations between her and Buntin had gotten to the point of sexual intimacy. An inference that Buntin's absence is ex-

plained by a liaison with the girl rests on an inference that she had joined him. Such reasoning is generally deprecated.

We have noted the testimony of physicians and friends as to the mental and physical characteristics of Buntin. That he was a type to which most suicides belong. That suicide was often in his mind and conversation. That his father committed suicide, and that a suicidal tendency is hereditary.

Dr. Burch, who was a friend as well as the physician of Buntin, among other things, describing Buntin, said that he had "no stomach for hardships," giving some illustrations. This young man was born into a wealthy family, had enjoyed comforts and luxuries always, and was accustomed to the best of living. None of the comforts and luxuries which he enjoyed come to him as the result of his merit. After attaining manhood, his mother made him an allowance and his grandfather gave him a job. The proof is clear that he could not unaided have earned anything like the living to which he was accustomed. In fact, the great weight of the proof is that he could not have made any sort of a living for the months immediately following his departure from home. By reason of his dissipations and ill health he did not have strength enough for manual labor and he had no adaptability for other steady employment. As a matter of fact, the months following his departure from home constituted a period when the business depression of the country was at its lowest. Thousands of skilled and capable men were out of work. There were no jobs for such men and certainly no jobs for a man like the insured. We are unable to see, in view of this young man's raising, his habits, and his physical and temperamental deficien-

cies, how he could have existed from September 24, 1931, to March 8, 1933, without assistance from someone. It is not suggested there was anyone upon whom he could have called for help except members of his family, and we think the jury were warranted in concluding that his family would have heard from him if he had lived for sixteen months after he left home. Hunger is a powerful emotion and would have, the jury may have thought, moved this young man to re-enact the parable of the prodigal son much before the expiration of his insurance, had he been alive.

If it should be granted that the young woman joined him, nevertheless the defendant's case is not strengthened. While it is said that she was a competent stenographer and bookkeeper, there were no places open for new employees during the times with which we deal. Certainly no girl could have gone into a strange town and obtained a job during these times that would have paid her sufficient to support both the young man and herself. It is hard to believe, were she living, she would have failed to call for some of the ample funds which were at her disposition. She must have heard of the deaths of her mother and brother, and though these things failed to influence, her necessities and Buntin's necessities would have moved her to call for some of her money.

The jury evidently attached little importance to the testimony about the man seen in Peru, thought by McClellan to have been Buntin. McClellan himself was not positive in his identification. The native witnesses only undertook to identify a photograph as that of a man they had casually seen some four years before their depositions were taken. It seems that Buntin had a deformed

454

ear, which stuck out from his head at right angles. None of these witnesses at Lima noticed such peculiarity of the man they saw.

Another circumstance that throws much doubt on the theory that the man seen in Lima was Buntin is that this individual, whoever he was, seemed to have money, ride in taxicabs, attend country clubs, patronize bars, and so on. It is not apparent where Buntin could have obtained means to carry on in such style. If Buntin had the *entree* to this country club and frequented that place, it would seem that the member who sponsored him, or members who had met him there, would have recalled him. That defendant might have gotten witnesses of a higher type than doormen, taxicab drivers, and bartenders.

A circumstance that impressed the court below was the failure of the defendant Life Insurance Company to locate Buntin. It appeared in the record that the average policy written by that Company is $3,000 in amount. That policies of $50,000 are unusual. The resources of defendant Company for making an investigation are shown to be ample. The amount involved would have justified defendant Company in making a very thorough investigation by way of establishing Buntin's continued existence after the expiration of the insurance. Of course defendant Company was not called upon to prove the plaintiff's case. Its refusal, however, to fully disclose the details and extent of its search for Buntin lends color to plaintiff's argument that such a disclosure would have shown a very thorough search. The only evidence tending to show Buntin's survival, however, that defendant was able to produce was the testimony of McClellan and the Peruvian witnesses.

■ As a further ground to support its motion for a directed verdict, defendant Company urges that this suit is barred by the six-year Statute of Limitations. Code 1932, section 8600. This contention is based upon the theory that the statute began to run at some period earlier than at the expiration of seven years from the disappearance of the insured. Such is not the rule recognized by the weight of authority.

"Although there is authority to a different effect, the great weight of authority supports the view that where the fact of death can only be determined through the aid of the statutory presumption of death from seven years' unexplained absence, the beneficiary's cause of action does not accrue until the expiration of the seven-year period following the disappearance of the insured, and the Statute of Limitations does not begin to run until that time." 29 Am. Jur., 1043.

Numerous decisions supporting the text just quoted are cited therender and see also Notes, 34 A. L. R., 91; 61 A. L. R., 686; 119 A. L. R., 1308; L. R. A. 1918B, 95.

■ The policies here in suit contain an obligation to pay "Upon receipt of due proof of the death of Thomas C. Buntin." Since it was necessary herein to resort to the seven years presumption in aid of the circumstances in evidence to make due proof of death, such due proof could not be made until the expiration of seven years from the insured's disappearance. The right of action, therefore, could not have accrued until after the expiration of the seven-year period. The policies did not fix any time limit in which due proof should be made.

For the reasons stated, the motion for a directed verdict in favor of defendant was properly overruled.

■ A number of errors are assigned with respect to

the refusal of the trial judge to give in charge certain requests offered. Some of these requests relate to the Statute of Limitations and were properly refused for the reasons just stated. Other requests, while in the main embodying correct principles of law, were merely elaborations of determinative principles more succinctly stated by the court in the main charge. To have given such requests would merely have tended to lengthen the charge without making it any clearer and would have been of no help to the jury.

To consider these requests in detail would unduly prolong this opinion. We have examined the charge carefully and regard it as a fair and easily understood statement of the law governing the case. We find no error or omission therein calling for reversal.

We think this was a jury case. The circumstances tending to show the death of the insured prior to the expiration of the insurance upon his life provided by the policies in suit are quite as cogent as those thought by other courts in the cases heretofore cited adequately to support verdicts upon the policies there in suit.

Affirmed.