SOUTHERN GAS CORPORATION of Tennessee, Plaintiff-in-Error, v. L. T. BROOKS et al., Trustees of Mt. Pleasant C. M. E. Church, Defendants-in-Error.— 359 S. W. (2d) 570.

Western Section. April 28, 1961.

Certiorari Denied by Supreme Court September 6, 1961.

Waldrop & Hall, Hewitt P. Tomlin, Jr., Jackson, for plaintiff-in-error.

Schneider, Schneider & Harris, Jackson, for defendants-in-error.

CARNEY, J. The plaintiffs below, L. T. Brooks, Hamp Brooks, George Brooks, Willie Meachem, Albert Davis, Booker T. Hunt and Guy Brooks, as trustees of the Mt. Pleasant Colored Methodist Episcopal Church recovered a judgment of $9,000 against the defendant, Southern Gas Corporation, for the destruction by fire of the church building and contents. $7,500 represented the value of the building and $1,500 the value of the contents destroyed by the fire.

From this judgment Southern Gas Corporation has appealed in error and filed six assignments of error all of

which raise the one question whether the Trial Judge erred in failing to grant defendant's motion for a directed verdict, both at the conclusion of the plaintiffs' proof and at the conclusion of all of the evidence in the case.

The Southern Gas Corporation, a corporation with its principal place of business at Jackson, Madison County, Tennessee, is engaged in the business of supplying and selling propane gas to approximately 1400 customers within a radius of 35 miles of Jackson, Tennessee. The Mt. Pleasant C. M. E. Church was located about five miles north of Jackson, Tennessee, on a rural road. The church had been heated prior to November 6, 1958, with coal.

In October, 1958, the plaintiff trustees contracted with the defendant for the purchase and installation of two thermostatically controlled 70,000 BTU gas floor furnaces and for the lease from the defendant of a 250-gallon tank for the storage of propane gas. The defendant agreed to make all necessary connections and installations of the equipment.

Mr. Hamilton, principal owner of the defendant corporation, testified that in 95% of the cases his company furnished the entire installation of the equipment necessary to the use of propane gas and, to use his words, " * * * we make a contract, go out, our men, we usually lease it out, the salesman or myself and I act as salesman in many cases, and we lease out the system and we guarantee it and agree to service it free of charge as long as they have it and we complete the job from the very beginning to the very end." (Tr. p. 225)

The contract price for the installation of the two floor furnaces was $430.00. On November 3, 1958, plaintiffs made a down payment of $120.00 to the defendant corpo-

4

ration. On the morning of November 6, 1958, Mose Robinson, janitor of the church, unlocked the church building at about 7:00 A. M. for the employees of the defendant to enter and install the floor furnaces. Shortly thereafter Mr. L. P. Deaton, foreman for the defendant corporation along with five employees arrived and began installing the floor furnaces, the storage tank and the other necessary pipes, fittings, valves, etc.

After the furnaces were installed and the storage tank filled with propane gas, the furnaces were lighted and burned for about fifteen minutes during which time Mr. Deaton and/or the other employees made checks of the valves, thermostats and connections. The furnaces seemed to be working properly. The employees found no leaks of gas in the connections and all the equipment appeared to be in good working order and properly installed. Mr. Deaton and the employees shut but did not lock the doors of the church and they left the premises about 12:00 noon.

Sometime shortly after 1:30 P. M. a neighbor, one Leo Bills, who is not a member of the church, was returning to his farm home from Jackson, Tennessee, and he saw dense smoke coming from the direction of the church when he was about one-half mile away. His first thought was that the smoke might be coming from his home but as he got nearer he realized that the smoke was coming from the church building.

When he got to the church there was no one around and the doors and windows appeared to be fastened. He summoned another neighbor, one Pearl Ardis, a member of the church. Pearl Ardis then called by telephone the witness, Mr. William Johnston, who was farming in the vicinity and asked him to bring his employee, Clyde Pear-

son, the Superintendent of the Sunday School, who was picking cotton for Mr. Johnston, over to the church.

Mr. Johnston came immediately with his employee, Clyde Pearson. We quote from his testimony as follows:

"Q. Are you familiar with the location of the Mt. Pleasant CME Church?

A. I am.

"Q. And approximately how long have you lived out in that vicinity, Mr. Johnston?

A. Some eight years.

"Q. And I would now, sir, direct your attention to the day of November the 6th, 1958, it was on Thursday, and ask you whether or not anything unusual happened sometime in the afternoon of that day?

A. Well, that's the day the church over there burned.

"Q. And what was it—Did you have any knowledge or did you learn that the fire—that the church was on fire?

A. I did.

"Q. And what did you do then, sir, when you learned that it was on fire?

A. Pearl Ardis called me and asked me if Clyde Pearson was picking cotton for me and I told her that he was and she said, the church is on fire over there and will you get him and bring him over here, and that's what I did.

"Q. And will you state to the gentlemen of the jury what transpired or what you saw when you got there?

A. Yes, sir, I will try to. When we got over there, wasn't anyone there; went up to the door to open the door of the church; there was so much pressure against it that we couldn't open it; whether it was locked or not, I don't know. I told Clyde, let's take a two by six, there was a two by six laying there and I told him let's pry that door open and see if we can put it out, so I took it and slammed it against the door and slammed it open, and when we did, I suppose smoke bulged out of it half as far as from here to that wall back yonder, if not further.

"Q. The smoke just came right out?

A. That's right, you couldn't see anything whatsoever then at all.

"Q. And what, if anything, did you do then, sir?

A. We went over to Pearl Ardis' house—that was the closest one that had a telephone, and called—telephoned the fire department and asked them if they would come out there. They said that they would, provided we put up a $100.00 and I turned to Clyde and asked him if he wanted to put up the $100.00 and he said, well, that might just be throwing it away because it looks like by the time they get here—the thing was well on the way anyhow—it wouldn't be saving very much and just tell them not to come and so that is what happened. We turned and called the gas company then about turning it off, about turning that tank off to keep it from exploding.

"Q. Do you know which gas company that was?

A. Southern Gas.

"Q. And did you talk to them?

A. I talked to someone in the office. I don't know who or whatnot.

"Q. What did they state to you?

A. They said they would send someone out there, which they did.

"Q. And what was the state of the fire when that someone arrived?

A. It was so far along that he just drove by and looked and never got out of the truck, if I can remember right.

"Q. And, Mr. Johnston, when you did throw open the doors there or knock open the door, what—you stated that smoke came out—could you determine any location or could you see anything at all?

A. It was just bulging up, looked like from the floor. Clyde wanted to go in there and get out some chairs and things and I told him there wasn't any need to go in there because you couldn't see, and at that time he was the only one up there.

"Q. And in your best estimate now, Mr. Johnston, approximately what time did you arrive at the scene of the church with Clyde?

A. With Clyde?

"Q. Yes, sir.

A. Somewhere around 2:00 o'clock. I don't know, it could have been a few minutes before or a few minutes after, I don't know.

"Q. But somewhere in the vicinity of 2:00 o'clock?

A. That's right."

The building burned for about two hours and was entirely consumed by the fire.

The church was a one-story building about 32 by 60 feet sitting on a concrete block and brick foundation. There was a wooden floor and wooden sub-floor. The interior walls were covered with a pine wainscoting up to a rail above which the interior walls were covered with sheetrock. The interior ceiling was a fiber board generally referred to as Celotex. The outside wall consisted of fire resistant white asbestos shingles nailed over storm sheeting which covered the studs.

Each floor furnace was a separate heating unit and they were installed just as they came from the manufacturer. The burner and pilot light where enclosed in a steel box near the bottom of the heating unit. Each unit swung down through the floor suspended by a metal flange that hung on the floor in which the units were installed. Rectangular holes approximately 30 by 36 inches were cut in the floor for the installation of each of these floor furnaces. A vent ran from each furnace under the floor to the outside of the building through the concrete block foundation.

The 250-gallon storage tank was set up some 20 to 30 feet outside the church building. A black metal pipe supply line approximately ¾ inch in diameter was run from the storage tank underground to the foundation and thence along under the floor joists of the building to supply fuel to the two floor furnaces. Copper tubes carried the fuel from the main supply line to each floor furnace.

Each floor furnace had a separate thermostat which was installed on an interior wall of the building. These

thermostats are described as self-energizing. They required no separate electrical circuit but operated on a very low voltage, which voltage was produced by heat generated by the pilot lights. Therefore, neither the floor furnace nor the thermostats were in any way connected with the electrical wiring in the church building.

Upon the trial before a jury the plaintiffs proved by all available witnesses that no one had been seen on the church property from the time the defendant's employees completed their installation and left the property until the fire was discovered by Leo Bills. Plaintiffs made no effort to prove the specific manner in which the building caught fire nor the specific acts or omissions of negligence of which they contended the defendant to be guilty. They relied upon the doctrine of res ipsa loquitur.

The Trial Judge overruled a motion for directed verdict made by defendant at the conclusion of the plaintiffs' proof. Thereupon the defendant introduced the officials of the Gas Company and the employees who installed the floor furnaces.

The foreman, Mr. Deaton, was shown to be highly experienced in the installation and maintenance of gas heaters, etc. He testified that he had supervised the installation of some 2600 gas heating appliances, including some 600 gas floor furnaces, during his past fourteen years as an employee of the Southern Gas Corporation and that prior to going to work for Southern Gas Corporation he worked in the State of Mississippi where he supervised the installation of approximately 1200 floor furnaces.

Mr. Deaton explained in detail the manner in which the floor furnaces were constructed and their operation

and also testified in detail as to the manner in which these floor furnaces were installed along with the storage tank and supply lines. Under his supervision the employee, Arlis Green, and the employee, James Pruitt, worked underneath the building and attended to hooking up the thermostats to the furnaces and in running the copper tubing from the supply line to the furnaces.

Mr. Deaton testified that he lighted both furnaces himself and let them each burn for approximately fifteen minutes and was satisfied that the furnaces were working correctly and were properly installed and that there were no leaks of gas in the connections and that the pressure from the storage tank was working properly. He said he turned the wall switches to "off position" leaving only the pilot light burning on each furnace and that thereupon he and three other employees left the premises sometimes shortly before noon. Two other employees had left earlier after the installation was underway to go to another job.

Mr. Deaton stated that with the switches in the "off position" no gas could come into the floor furnaces except to burn the pilot lights until the switches were turned back to the "on position." Further, on the basis of his 22 years experience and with his knowledge of the manner in which these furnaces were installed he stated in substance that the fire in the building could not have originated from the floor furnaces.

Mr. Long, a salesman for the Southern Gas Corporation, testified that he sold the furnaces to the plaintiffs and that they were properly located inside the building so as not to be near any combustible material such as

draperies, etc., and that in his opinion they were properly installed.

James Pruitt testified that he had worked for the Southern Gas Corporation two years and that he "holped" to install the pipe under the church and "holped" on the thermostats and "holped" check the furnaces after the installation was through. He testified that after hooking the thermostat wires to the control and after hooking the copper pipe leading from the main line of black pipe to the control on the burner he checked the valve for gas leaks by a lighted match around the connections. He said he found no leaks of any kind.

The defendant's witness, Paul Lyons, testified that he had been employed by Southern Gas Corporation since August, 1958, and that he, among other things, put an air pressure test on the line leading from the supply tank to the furnaces.

The witness, Arlis Green, testified that at the time of the trial he was employed by Gulf Oil Corporation but that he was a member of the crew which installed the floor furnaces in the Mt. Pleasant C. M. E. Church on November 6, 1958; that he worked under the floor helping James Pruitt connect the thermostats to the floor furnaces and connect the copper tubing from the main supply line to the furnaces. The implication of his testimony is that he hooked up one furnace and that James Pruitt hooked up the other. Mr. Green testified that he too used the match test to check the line, controls and the valves for leaks and that he found none. He testified that it was dark under the floor of the building, that they had to crawl around on their hands and knees to do the work and that

they used an electric light from an extension cord that was hooked up somewhere in the church.

The defendant offered one expert witness, Mr. Tom Lewis, assistant fire chief of the Jackson, Tennessee, Fire Department. The substance of Mr. Lewis' testimony is that in his opinion based on the information that the roof of the building fell in before the walls that the fire in the church building must have originated somewhere under the roof of the church.

The Trial Judge charged the jury on the doctrine of res ipsa loquitur and the jury found in favor of the plaintiffs.

In the very able and exhaustive brief furnished us by attorneys for the plaintiff-in-error nearly every Tennessee case dealing with res ipsa loquitur is cited and discussed, also many cases from other jurisdictions.

The courts of the various states are far from uniform in their decisions relating to the liability for damages resulting from installation of various types of heating units. See 72 A. L. R. (2d) 865—Annotation: Gas Burning Appliances—Liability.

. Since we find ample authority in our own Tennessee cases we do not prolong this opinion with a discussion of the many cases from foreign jurisdictions.

We think a decision of the case at bar is controlled by the principles announced in three Tennessee cases: Sullivan v. Crabtree, 1953, 36 Tenn. App. 469, 258 S. W. (2d) 782; Roberts v. Ray, 1958, 45 Tenn. App. 280, 322 S. W. (2d) 435; and Johnson v. Ely, 1947, 30 Tenn. App. 294, 205 S. W. (2d) 759.

In Sullivan v. Crabtree, supra, the parents brought suit for the death of their son who was killed when a large

tractor-trailer truck owned by Hoover Motor Express Company and driven by Defendant Crabtree swerved off the highway and overturned down a steep embankment. Their son, Robert Sullivan, was riding as a guest in the truck.

The defendant, Crabtree, testified that there was loose gravel on the highway and he lost control of the truck. The driver said that he did not know what caused him to lose control; the brakes could have failed or grabbed, he did not know.

The case went to the jury and there was a verdict for the defendant. Plaintiffs appealed contending that under the res ipsa loquitur doctrine the jury was required to find negligence on the part of the driver because he offered no reasonable explanation disproving negligence.

This court, speaking through Judge Felts, now a Justice of the Tennessee Supreme Counrt, affirmed the judgment of the lower court in favor of the defendant. From the excellent opinion of our learned colleague we quote at length as follows:

"The classic statement of the doctrine of res ipsa loquitur is this: 'Where the thing (causing the harm) is shown to be under the management of defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.' Erle, C. J., Scott v. London and St. Katherine Docks Co. (1865), 3 H. & C. 596, 159 Eng. Reprint 665, 667.

"This statement has been accepted in our cases. John Bouchard & Sons Co. v. Keaton, 9 Tenn. App. 467, 479; North Memphis Savings Bank v. Union Bridge & Const. Co., 138 Tenn. 161, 177, 196 S. W. 492; Lewis v. Casenburg, 157 Tenn. 187, 7 S. W. (2d) 808, 60 A. L. R. 254; Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 230 S. W. (2d) 659.

"The maxim res ipsa loquitur means that the facts of the occurrence evidence negligence; the circumstances unexplained justify an inference of negligence. In the principle of proof employed, a case of res ipsa loquitur does not differ from an ordinary case of circumstantial evidence. Res ipsa loquitur is not an arbitrary rule but rather 'a common sense appraisal of the probative value of circumstantial evidence.' Boykin v. Chase Bottling Wrks, 32 Tenn. App. 508, 520-523, 222 S. W. (2d) 889, 896.

"This maxim does not generally apply to motor vehicle accidents, but it may apply to such an accident where the circumstances causing it were within the driver's control and the accident was such as does not usually occur without negligence. So where a motor vehicle, without apparent cause, runs off the road and causes harm, the normal inference is that the driver was negligent, and res ipsa loquitur is usually held to apply.

"Some of the authorities supporting this view are: Tabler v. Perry, 337 Mo. 154, 85 S. W. (2d) 471; Adams v. LeBow, 236 Mo. App. 899, 160 S. W. (2d) 826; Masten v. Cousins, 216 Ill. App. 268; Smith v. Kirby, 115 N. J. L. 225, 178 A. 739; Kinary v. Taylor, 243 App. Div. 651, 276 N. Y. S. 688; cf. Galbraith v.

Busch, 267 N. Y. 230, 196 N. E. 36; 9 Blashfield, Cyclopedia of Automobile Law (1941 Ed.) sec. 6045; 5 Am. Jur., Automobiles, sec. 608; Annotation, 93 A. L. R. 1101.

"This Court applied res ipsa loquitur in Greyhound Lines, Inc., vs. Patterson, 14 Tenn. App. 652, where a bus ran off the road and injured an occupant. But that was a suit by a passenger against a carrier, where liability is stricter than in the case of a guest. However, insofar as such an action is based on negligence, rather than a breach of contract, the test is the same as in a suit by a guest, and what will evidence negligence in the one case will do so in the other. See Boykin v. Chase Bottling Works, supra, 32 Tenn. App. 508, 518-519, 222 S. W. (2d) 889; Cincinnati N. O. & T. P. R. Co. v. South Fork Coal Co., 6 Cir., 139 F. 528, 534, 1 L. R. A., N. S., 533, 538.

" 'A res ipsa loquitur case is a circumstantial evidence case which permits a jury to infer negligence from the mere occurrence of the accident itself.' Prosser, Res Ipsa Loquitur in California, 37 Cal. L. Rev. 183, 191. So after proof of the rem the adding of another fact or facts may supply the explanation and take the case out of the rule. For example, see Granert v. Bauer, 17 Tenn. App. 370, 373, 67 S. W. (2d) 748 (where driver ran out of road trying to miss a hole); Oliver v. Union Transfer Co., 17 Tenn. App. 694, 698, 71 S. W. (2d) 478 (where side of road caved in taking the bus with it).

"So we agree with learned counsel for plaintiffs that the facts of this case brought it within the maxim res ipsa loquitur. The accident was such as does

not usually occur without negligence, and the cause of it was in control of the driver, or rather it resulted from his loss of control of the truck, which he could not explain.

"While we agree that these facts made a case of res ipsa loquitur, we do not agree that they, though unexplained, required an inference or finding of negligence, or that the jury could not reasonably refuse to find negligence and return a verdict for defendant, or that there was no evidence to support their verdict for him.

"It is true there has been confusion in the cases as to the procedural effect of res ipsa loquitur, some cases giving it one and some another of these three different effects:

"(1) It warrants an inference of negligence which the jury may draw or not, as their judgment dictates. Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 442-443, 230 S. W. (2d) 659; Boykin v. Chase Bottling Works, 32 Tenn. App. 508, 522-523, 222 S. W. (2d) 889.

"(2) It raises a presumption of negligence which requires the jury to find negligence if defendant does not produce evidence sufficient to rebut the presumption. Gill v. Brown, 130 Tenn. 174, 178, 169 S. W. 752; Kay v. Metropolitan Street R. Co., 163 N. Y. 447, 57 N. E. 751; Prosser on Torts, 304; cf. Foltis, Inc. v. City of New York, 287 N. Y. 108, 38 N. E. (2d) 455. 153 A. L. R. 1122; Annotation, 153 A. L. R. 1134.

"(3) It not only raises such a presumption but also shifts the ultimate burden of proof to defendant and

requires him to prove by a preponderance of all the evidence that the injury was not caused by his negligence. Turnpike Co. v. Yates, 108 Tenn. 428, 434, 67 S. W. 69; Gorsuch v. Swan, 109 Tenn. 36, 69 S. W. 1113, 97 Am. St. Rep. 836; Prosser on Torts, 304, 305.

"For a review of the numerous cases and a clear and helpful discussion of the subject, see: Prosser, The Procedural Effect of Res Ipsa Liquitur (1936), 20 Minn. L. Rev. 241-271; Prosser, Res Ipsa Loquitur in California (1949), 37 Cal. L. Rev. 183-234; Prosser on Torts (1941) 291-310.

"The effect of a case of res ipsa loquitur, like that of any other case of circumstantial evidence, varies from case to case, depending on the particular facts of each case; and therefore such effect can no more be fitted into a fixed formula or reduced to a rigid rule than can the effect of other cases of circumstantial evidence. The only generalization that can be safely made is that, in the words of the definition of res ipsa loquitur, it affords 'reasonable evidence,' in the absence of an explanation by defendant, that the accident arose from this negligence.

"The weight or strength of such 'reasonable evidence' will necessarily depend on the particular facts of each case, and the cogency of the inference of negligence from such facts may of course vary in degree all the way from practical certainty in one case to reasonable probability in another.

"In exceptional cases the inference may be so strong as to require a directed verdict for plaintiff, as in cases of objects falling from defendant's premises in the highway, such as Byrne v. Boadle (1863),

2 H. & C. 720, 159 Eng. Reprint 299 (a barrel of flour fell from a window of defendant's warehouse); McHarge v. M. M. Newcomer & Co., 117 Tenn. 595, 100 S. W. 700, 9 L. R. A., N. S., 298 (an awning roller fell from defendant's building); and Turnpike Co. v. Yates, supra (a toll gate or pole fell on a traveler); cf. Annotation, 153 A. L. R. 1134.

"In the ordinary case, however, res ipsa loquitur merely makes a case for the jury—merely permits the jury to choose the inference of defendant's negligence in preference to other permissible or reasonable inferences. North Memphis Savings Bank v. Union Bridge & Const. Co., 138 Tenn. 161, 188, 196 S. W. 492; John Bouchard & Sons Co. v. Keaton, 9 Tenn. App. 467, 480-481; Boykin v. Chase Bottling Works, 32 Tenn. App. 508, 523, 222 S. W. (2d) 889, Poor Sisters of St. Francis v. Long, Prosser, Res Ipsa Loquitur in California, 37 Cal. L. Rev. 183, 217-225.

"We think this is true in the case before us. The cause of the death sued for was defendant's loss of control of the truck. This may have been due to his own negligence, or it may have been due to no fault of his—an unavoidable accident resulting from the brakes giving way or the breaking of some part of the control mechanism of the truck. Since such conflicting inferences might be reasonably drawn from the evidence, it was for the jury to choose the inference they thought most probable; and we cannot say that there was no evidence to support their verdict for defendant."

In Roberts v. Ray, supra, the plaintiff, Ray, recovered a judgment against the defendant, Roberts, for damages to his store building sustained when Defendant Ray's driverless automobile rolled downhill into plaintiff's store building. The defendant, Ray, had parked his automobile on an incline some three hours before it rolled down against the plaintiff's store. No witnesses saw the car start rolling and no witnesses attempted to explain how or why it began to roll. There was no evidence that anyone had been near or meddling with the automobile after it had been parked by the defendant owner. The Trial Judge sitting without a jury found in favor of the plaintiffs. Apparently the defendant in his testimony exculpated himself from negligence.

This court, again speaking through Judge Felts, affirmed the action of the lower court. From this opinion we quote as follows:

"The general rule for all cases of circumstantial evidence—both ordinary cases and res ipsa loquitur cases—is that to make out his case, plaintiff does not have to eliminate all other possible causes or inferences than that of defendant's negligence; but it is enough if the evidence for him makes such negligence more probable than any other cause. Boykin v. Chase Bottling Works, supra; Sullivan v. Crabtree, supra; Prosser on Torts (2nd ed.) 204; Law v. Louisville & N. R. Co., 179 Tenn. 687, 698-699, 170 S. W. (2d) 360, 364.

"Defendant stresses the fact that, according to the proof, some three or four hours elapsed between the time he said he parked his car and the time when the accident happened. The time element is only a

circumstance against the inference of negligence in cases where there are other circumstances tending to show that the harm resulted from some other cause than defendant's negligence.

"As stated above, defendant was unable to explain the cause of the accident, unable to show that it was caused by the intermeddling of any other person or by any other cause than that of defendant's negligence. There are some discrepancies in his testimony and contradictions between it and testimony of other witnesses, so that it was for the Trial Judge to say how much of defendant's testimony would be believed.

"Defendant cites a number of cases from other jurisdictions. We think we need not discuss them, since our own cases, above cited, and the facts of this case support the Trial Judge's findings and conclusions, with which we fully concur.

"While the hearing of this case here is de novo, it being a non-jury case, the Trial Judge's conclusion is supported by a presumption of correctness unless the evidence preponderates against it (T.C.A. sec. 27-303); and the burden is on defendant-appellant to show that the evidence does preponderate against it. Jackson v. Jackson, 25 Tenn. App. 198, 202, 154 S. W. (2d) 797; Morrell v. Republic Fire Ins. Co. of Pittsburg, 168 Tenn. 137, 140, 76 S. W. (2d) 317, 318.

"The Trial Judge's findings are entitled to great weight in such a case as this where he saw and heard the witnesses, and observed their manner and demeanor on the stand, and is, therefore, in much better

position than we are to judge the weight and value of their testimony. This is particularly so in this case, since we have nothing to look to but the meager narrative of the bill of exceptions. Clardy v. Clardy, 23 Tenn. App. 608, 612, 136 S. W. (2d) 526; Hepburn v. Milwaukee Mechanics Ins. Co., 27 Tenn. App. 612, 616, 183 S. W. (2d) 772.

"We think the evidence for plaintiff made a res ipsa loquitur case of circumstantial evidence, calling on defendant for an explanation; that he failed to give any satisfactory explanation; and that the evidence fully supports and preponderates in favor of the Trial Judge's findings and conclusions."

However, attorneys for plaintiff-in-error very forcefully make the argument that before one can invoke the doctrine of res ipsa loquitur, the plaintiff must prove by direct evidence the act, agency or thing which caused the injury. They cite in support of this argument a number of Tennessee cases including De Glopper v. Nashville Railway Co., 123 Tenn. 633, 134 S. W. 609, 33 L. R. A., N. S., 913; Memphis Street Railway Co. v. Cavell, 135 Tenn. 462, 187 S. W. 179; North Memphis Savings Bank v. Union Bridge and Const. Co., 138 Tenn. 161, 196 S. W. 492; Sloan v. Nevil, 33 Tenn. App. 100, 229 S. W. (2d) 350; Delaney v. Turner, 34 Tenn. App. 380, 381, 237 S. W. (2d) 965; Moon v. Johnston, 47 Tenn. App. 208, 337 S. W. (2d) 464.

We must respectfully disagree with this insistence. "Any fact may be proved by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. In civil cases facts are proved by a preponderance of the evidence. If unequal conflicting

probabilities, or unequal inconsistent theories are shown by the evidence; or if the minds of reasonable men might differ from the proved facts as to whether the conflicting probabilities, or inconsistent theories, are equally supported by the evidence, the case must go to the jury. Law v. Louisville, etc., Railroad Co., 179 Tenn. 687, 699, 170 S. W. (2d) 360; New York Life Insurance Company v. Nashville Trust Co., 178 Tenn. 437, 159 S. W. (2d) 81; Bryan v. Aetna Life Insurance Co., 174 Tenn. 602, 130 S. W. (2d) 85; Knights of Pythias v. Steele, 107 Tenn. 1, 63 S. W. 1126; Pickard v. Berryman, 24 Tenn. App. 263, 142 S. W. (2d) 764; * * * Jones Commentaries on Evidence, Second Edition, Revised and Enlarged, page 23, section 12.

"The trial judge should direct a verdict for defendant, and hold as a matter of law that there is no evidence to support the verdict when the proved facts and circumstances give equal support to the inconsistent theories of plaintiff and defendant. Law v. Louisville, etc., R. Co., supra; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819." Phillips v. Newport, 28 Tenn. App. 187, 187 S. W. (2d) 965, opinion by Judge Hickerson.

In the case of Johnson v. Ely, supra, plaintiff brought suit for damages alleging that the defendant, Dr. Ely, had negligently left a needle in her abdomen when he removed her appendix in 1941. The needle was removed from the plaintiff's abdomen in 1946. The plaintiff offered no direct evidence as to how the needle got in her body but relied entirely upon circumstantial evidence such as the finding of the needle in proximity to the area of the original operation by the defendant, Dr. Ely, and the fact

that a sharp jabbing pain in the area followed the operation by Dr. Ely and persisted until the needle was removed in 1946, then ceased after the needle was removed.

The defendant, Dr. Ely, testified that the needle which was removed from the plaintiff's abdomen in 1946 was an ordinary sewing needle and not a surgical needle; that he did not use a needle of this type in his removal of the plaintiff's appendix in 1941. He further testified that while it was possible that a needle could have dropped into the incision in 1941, he had no knowledge that such had occurred. The defendant also offered as possible explanations of the presence of the needle in plaintiff's abdomen as follows:

"(a) That the needle may have been left in a gauze packing prepared by seamstresses at the hospital and used within the incision, (b) that it may have been introduced into the body in a gauze packing by Dr. Spessegger of Charleston, S. C., who did a curettement of the womb in 1943, and migrated to the omentum between the date of that treatment and the date of removal by Dr. Smith in 1946, (c) that it may have been swallowed during infancy and (d) that it may have entered the body without causing pain (and without plaintiff being conscious of its presence) through the foot or buttocks."

The Trial Judge directed a verdict for the defendant and the plaintiff appealed. This court, in an opinion by Judge McAmis, now presiding judge, reversed the action of the Trial Judge and remanded the cause for a trial by jury. From his opinion we quote as follows:

"When plaintiff established by credible proof circumstances from which a reasonable mind might

infer that the needle entered during the operation she was entitled to have her case go to the jury unless defendant by proof offered some explanation which all reasonable minds must agree destroyed the probative force of the circumstances offered as making out her case. The defendant could not do this conclusively and as a matter of law by offering evidence that it might have happened in some other way, any more than a plaintiff can have a verdict on such evidence. Proof that a thing might occur in a certain way is not proof that it did in fact.

"It was for the jury to weigh the probabilities in the light of all the proof and determine the weight of the inferences to be reasonably drawn from the circumstances relied upon by plaintiff in the light of the possibilities or probabilities appearing from the proof offered by defendant. Because there were possibilities or even probabilities opposed to the circumstantial evidence in the case did not overcome as a matter of law the force of the circumstantial evidence, and in such a case a verdict based on the whole evidence would not be the product of speculation and conjecture. Law v. Louisville & N. R. Co., 179 Tenn. 687, 170 S. W. (2d) 360.

"(3) Assuming, as we have found, that there was circumstantial evidence that the needle entered through the incision and that the explanations and circumstances offered by defendant are not sufficient as a matter of law to dissipate the inferences favorable to plaintiff, did the proof for defendant overcome as a matter of law the inferences of negligence under res ipsa loquitur?

"In general the weight of an inference to be drawn from the evidence, as well as the explanation offered to meet the inference, is for the determination of the jury. 53 Am. Jur. 160, Trial, Sec. 187.

"Under res ipsa loquitur when the inferences of negligence which arise under that doctrine are rebutted by opposing evidence, the weight of the inference is for the jury unless uncontradicted explanatory evidence excludes the inference that the injury resulted from the want of ordinary care. Explanations showing that the injury might have occurred from some other cause not attributable to defendant's negligence is not sufficient to take the case from the jury. Casenburg v. Lewis, 163 Tenn. 163, 40 S. W. (2d) 1038. And see 38 Am. Jur. 1032; Terminal R. Ass'n of St. Louis v. Staengel, 8 Cir., 122 F. (2d) 271, 136 A. L. R. 789.

"We think the proof for defendant is too inconclusive to justify a directed verdict. The proof shows that it was the duty of the nurse to keep track of needles in the operating room and, under Dr. Copenhaver's testimony, if there was a needle in the gauze she could have found it. Though it is not insisted the surgeon could search for needles, he is responsible for the acts of the nurse during the operation. Needles were not counted at the end of the operation and whether the nurse was negligent in not making such a count at the end of the operation would present a question for the jury. Proof that the operation was conducted according to customary and accepted methods and approved technique is not conclusive on the issue of negligence. Nashville C. & St. L. R. Co. v.

Wade, 127 Tenn. 154, 153 S. W. 1120, Ann. Cas. 1914B, 1020; Smith v. Fisher, 11 Tenn. App. 273.

"The assignments directed to the action of the court in directing a verdict are, accordingly, sustained."

In the case at bar these salient facts appear: There was no fire in the church building when the defendant's employees entered and began installing the two floor furnaces; the defendant's employees left the building approximately 12:00 o'clock noon with the pilot lights on the furnaces burning and a highly combustible material, propane gas, connected to the floor furnaces; not later than 2:00 P.M. the interior of the church was discovered to be burning; and there was no proof that any other person had been about the church premises from the time the defendant's employees left until the fire was discovered. From these circumstances we think that reasonable minds might find as a fact that the church building caught on fire as a result of propane gas being ignited by one of the pilot lights which was left lighted by defendant's employees.

There is no proof or suggestion that any of the equipment installed by the defendant was in any manner tampered with after being installed by the defendant's employees and therefore, the defendant must be considered as continuing in the exclusive control and management of said equipment at the time of the fire.

A finding of fact by the jury that the church building caught on fire as a result of propane gas being ignited by one of the pilot lights left lighted by the defendant's employees carries with it the inference under the res ipsa

loquitur doctrine that the defendant's employees were guilty of negligence in the installation of the floor furnaces and/or fuel lines.

It is true that the defendant's foreman, Mr. Deaton, and the other employees affirmatively testified that they installed the equipment in a proper manner. However, they offered no explanation or proof as to how the fire in the church did originate except the opinion of Chief Lewis that it started in the roof of the church. We hold that the inference of negligence on the part of the defendant's employees in the installation of the gas burning equipment arising under the res ipsa loquitur doctrine was not conclusively rebutted by their testimony and that of Chief Lewis.

We think His Honor the Trial Judge properly overruled the motion for directed verdict made at the conclusion of plaintiffs' proof and again at the conclusion of all the proof and properly submitted the issue of the negligence of the defendant's employees to the jury. Hence, all of the assignments of error are respectfully overruled. A judgment will be entered in this court in favor of the plaintiffs in the amount of $9,000 plus interest from July 6, 1960, the date of overruling the motion for new trial. The costs in the court below and in this court will be taxed against the plaintiff-in-error, Southern Gas Corporation, and its surety.

Avery, P. J. (W. S.), and Bejach, J., concur.